HAMILTON (TEX) MAULE, Respondent, v NYM CORPORATION et al., Appellants.

First Department, July 3, 1980

## APPEARANCES OF COUNSEL

*Howard M. Squadron* of counsel *(Neal M. Goldman, Ira Lee Sorkin* and *Slade R. Metcalf* with him on the brief; *Squadron, Ellenoff, Plesent & Lehrer,* attorneys), for appellants.

*Alfred S. Julien* of counsel *(Sybil Shainwald* and *William D. Fireman* with him on the brief; *Julien, Schlesinger & Finz, P. C.,* attorneys), for respondent.

## OPINION OF THE COURT

MURPHY, P. J.

Defendant Treadwell wrote an article entitled "And Now for the Good News at Time, Inc.", for the June 22, 1973 issue of *New York Magazine* (Magazine). The Magazine was then

published by defendant NYM Corporation (Corporation). The article dealt primarily with the rejuvenation and success of *Sports Illustrated* magazine (SI) under the control of its managing editor, Andre Laguerre. In the course of the article, Treadwell made the following comments upon Maule and his ability as a writer for SI:

"Top executives in Henry Luce's empire tend to be Ivy League types who drink martinis and look good wearing club ties and blue suits. Laguerre remains aloof from them and usually manages to be absent from weekly luncheons of company brass, choosing, instead, to spend each midday drinking with associate editor M. R. (Morrie) Werner and senior writer Tex Maule, two men who have managed to crack the Old Man's shell and earn his friendship * * *

"Tex Maule's hold on the managing editor is more difficult to understand. Maule has for a decade been the most famous of *Sports Illustrated's* writers, and as one editor says, 'His career would make an interesting minor—very minor—novel.' Maule, who in his youth was a trapeze artist, is not a graceful wordman. He is quite possibly the worst writer on the magazine, and yet he owns the professional football beat, the most widely read and important writing assignment in *Sports Illustrated.* On Sunday evenings during the football season the magazine mobilizes itself to rewrite Maule's copy. Contradictions are removed, paragraphs are juggled, and anecdotes are inserted. His original Western Union file is transformed under intense deadline pressure into an entertaining, well-written story. Yet he maintains his beat year after year, not least because he is Laguerre's longtime drinking companion."

Based upon the foregoing excerpt (excerpt), plaintiff Maule brought this libel action. At trial, Maule testified that he had been in the writing field since 1937. He had been a sportswriter for SI from 1956 until 1975. During that period he covered the activity in professional football and many other fields of athletic endeavor. Maule had written 28 books on sports, both fiction and nonfiction. He had received numerous awards for his books and stories. By his own words, Maule admitted that he was probably one of the best known sportswriters at SI because he wrote about professional football, the most popular sport.

In order to establish his competency as a writer, Maule called several editors and writers who had worked with him at SI. The testimony of Andrew Crichton, a senior editor, was

typical of the evidence presented on Maule's behalf. Crichton alleged that Maule's copy did not require any unusual editing vis-à-vis the copies of other writers. Maule's copy was entertaining and often original. Crichton concluded that Maule was one of the better writes at SI.

Defendant Treadwell testified that he had been employed at SI from 1968 to 1971. He started as a "checker" and was later promoted to a writer. During that period, Treadwell had worked directly with Maule on two Superbowl assignments. He had also read a total of 30 pieces submitted by Maule; 10 of these pieces he had read very carefully. In Treadwell's estimation, Maule was quite possibly the worst writer on the staff. After comparing Maule's original copies as against his published articles, Treadwell saw that there were "great differences". These differences were attributable to the unusual editing done by the SI staff. In preparing the article for the Magazine, Treadwell had been assisted by a "checker" named Morgan.

Treadwell called many witnesses to support his contention as to Maule's incompetency. The testimony of Richard Johnston, a former senior editor at SI, was characteristic of the proof presented on defendants' behalf. Treadwell had conferred with Johnston before the preparation of the article. Johnston confirmed that, during the football season, it took a major effort on the part of the SI staff to edit the pieces submitted by Maule.

The trial court refused to find that Maule was a "public figure" under *New York Times Co. v Sullivan* (376 US 254) and its progeny. It left for the jury to decide which statements were opinion and which were fact. In the charge, the defendant was given the burden of proving that the various statements in the excerpt were true. The trial court further instructed that, if the jury found the excerpt privileged, the verdict would be for defendant Treadwell unless they found he acted solely out of personal spite or ill will toward the plaintiff. The jury was permitted to award punitive damages if they found that the defendants had acted maliciously or with reckless disregard of the truth.

The jury found for Maule against both defendants in the sum of $200,000 compensatory and $75,000 punitive damages. Maule later stipulated to a reduction in the award to $75,000 compensatory and $35,000 punitive damages.

■ Viewed most favorably to the plaintiff, the evidence

established that he was libeled in his professional capacity as a writer (34 NY Jur, Libel and Slander, § 36) and that he suffered "actual injury" in the contemplation of *Gertz v Robert Welch, Inc.* (418 US 323, 349, 350) by reason of that libel. Thus, the first issue actually presented is whether Maule was a "public figure". Generally, those classified as a "public figure" have thrust themselves to the forefront *(Gertz v Robert Welch, Inc, supra,* at p 345). The essential element underlying the category of "public figures" is that the publicized person has taken an affirmative step to attract public attention *(James v Gannett Co.,* 40 NY2d 415, 422). In the literary area, a well-known physician was held to be a "public figure" by reason of the extensive publication of his book on dieting. *(Atkins v Friedman,* 49 AD2d 852.) Similarly, plaintiff Maule has become a "public figure" through his many books and articles in the sports field. In his own testimony, Maule even confirmed the fact that he was a famous writer.

As a "public figure", Maule had the burden of proving the falsity of the statements in the subject excerpt. Furthermore, it was his obligation to establish with convincing clarity that the statements were made with actual malice, i.e., with knowledge of their falsity or with reckless disregard of the truth. *(Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, 380.)* Plaintiff was not entitled to recover either compensatory or punitive damages unless he established actual malice *(Gertz v Robert Welch, Inc., supra,* at pp 342, 349). The trial court erred in failing to charge in accordance with the foregoing principles. At the very least, the errors in the charge require that a new trial be ordered.

The second issue presented is whether the statements in the excerpt are fact or opinion. It is often difficult to distinguish between "fact" and "opinion" (see 50 Am Jur 2d, Libel and Slander, § 289). Opinions are constitutionally protected and may not be the subject of private damage actions, providing that the facts supporting the opinion are set forth. It is for the court to determine, as a matter of law, whether a statement is fact or opinion. *(Rinaldi v Holt, Rinehart & Winston, supra,* at pp 380, 381.)

In the excerpt under discussion, Treadwell's statement that the SI staff rewrote Maule's copy is one of fact. Likewise, Treadwell's bare assertions that Maule was not a "graceful wordman" and quite possibly the "worst writer" at SI were statements of fact. It should be emphasized that Treadwell

never mentioned in the article that he was formerly employed at SI and that he had read Maule's copy as it was submitted. Had such background facts been stated, Treadwell's characterization of Maule's writing ability would be classified as statements of opinion. (See Gately, Libel and Slander [6th ed], § 709, p 321.) In the absence of those background facts, a reader is left with the impression that Treadwell's conclusions were based upon information supplied by an unnamed "editor". The conclusions must thus be read as statements of fact rather than opinion. However, Treadwell did state that Maule maintained his "beat" because he was Laguerre's "long-time drinking companion". This last statement must be considered one of opinion since the facts forming the basis for the conclusion are stated. The remaining statements in the excerpt warrant no further discussion.

This analysis, separating fact from opinion, would be useful to a court presiding at a new trial of this action. Nonetheless, the ultimate question still posed on this appeal is whether the action should be dismissed as a matter of law. Therefore, for purposes of discussion, it will be assumed that all the statements in the excerpt are factual. Suffice it to say that plaintiff Maule did adduce sufficient evidence whereupon a jury could find that the factual averments in the excerpt were false. Again, assuming that the factual statements are false, plaintiff had the burden of showing that the defendants were motivated by actual malice before he may recover. *(Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065.)*

■ The third issue is whether Maule established that Treadwell made the false statements with knowledge of their falsity or with reckless disregard of the truth. Reckless conduct is not measured by whether a reasonably prudent man would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that a particular defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for the truth and demonstrates actual malice *(St. Amant v Thompson, 390 US 727, 731)*. Failure to investigate does not in itself establish bad faith *(St. Amant v Thompson, supra, at p 733)*. A showing of mere negligence is insufficient to support a finding of actual malice. *(New York Times Co. v Sullivan, 376 US 254, 288, supra.)*

The record indicates that Treadwell, on the basis of his employment at SI, formed the opinion that Maule's copy was

not well written and that, as a matter of course, it was substantially rewritten by the SI staff. Treadwell, however, did not rely solely upon his own impression of Maule's professional ability. Before the article was written, Treadwell solicited the views of his associates on this subject. As was previously mentioned, many of Treadwell's associates shared his belief that Maule's copy required unusual editing. While a jury could conclude that Treadwell's evaluation of Maule's ability was incorrect, the fact remains that Treadwell did make a good faith attempt to reach the truth in this matter. Consequently, plaintiff Maule did not carry his burden of showing that Treadwell made the statements with knowledge of their falsity or did so in reckless disregard of the truth. For this reason, the case against Treadwell must be dismissed.

Plaintiff's claim against the Corporation must also fail. Plaintiff Maule made no demonstration that the Corporation had any substantial reason to question the accuracy of the article *(Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 382, 383, *supra).* In addition, the Corporation appointed a "checker" to substantiate the accuracy of the article. Any errors in the excerpt must be assigned to the Corporations's negligence rather than to its actual malice against the plaintiff.

Accordingly, the judgment of the Supreme Court, New York County (HELMAN, J.), entered February 16, 1979, awarding plaintiff Maule, after a jury trial, $75,000 in compensatory and $35,000 in punitive damages, should be reversed, on the law, and the complaint should be dismissed, with costs.

SANDLER, J. (dissenting in part). As correctly observed in the court's opinion, the dispositive question here is whether the plaintiff was a public figure within the meaning of the line of cases having their genesis in *New York Times Co. v Sullivan* (376 US 254). The question seems to me a very close one.

The most authoritative definition of the term by the Supreme Court was set forth in *Gertz v Robert Welch, Inc.* (418 US 323, 345). "For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies

in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

I doubt that the plaintiff was a public figure within the definition set forth in *Gertz (supra)* with regard to the article at issue here. The record is barren of any intimation that he had thrust himself forward into public controversies that gave rise to the comments about him challenged in this lawsuit.

However, the concept was given what seems to me a somewhat more expansive interpretation by the Court of Appeals in *James v Gannett Co.* (40 NY2d 415). The plaintiff there was a professional nightclub dancer, whose performances had aroused public curiosity and prompted the publication of a feature article about her in a newspaper. She had given an interview in connection with the article.

In its opinion, the court noted as the essential element underlying the category of public figures that the publicized person "has taken an affirmative step to attract public attention." *(James v Gannett Co., supra,* at p 422.) Thus, it described as "[i]ncluded, without doubt * * * many types of public performers such as professional athletes, nightclub and concert singers, television and movie actors, and recording artists." These were viewed as "persons in whom the public has continuing interest" and the natural subject of attention by newspapers and magazines of general circulation because of that public interest. *(James v Gannett Co., supra,* at p 422.)

The plaintiff does not fit neatly within the category described by the Court of Appeals in *James (supra).* Unlike James, he did not give an interview looking forward to publicity, and there is no indication that he was anxious to encourage for business reasons public attention or that there was in fact any degree of public interest in him prior to the publication of the article. However, I have difficulty in seeing a clear distinction between public performers described by the Court of Appeals in the *James* opinion *(supra)* and a weekly sports columnist in a widely circulated magazine who had come to be considered a leading authority on professional football.

The question would be much simpler if the article had attacked plaintiff with regard to the quality and trustworthiness of his published writing concerning sports events and personalities that were a matter of public interest. I doubt that there was a significant public interest, if indeed any, in plaintiff's ability to write skillfully under tight deadlines or in the degree of rewriting that his work under such circum-

stances required in comparison to others. Nonetheless, and not without serious reservations, I agree that for the purpose of determining the applicability of the requirement of constitutional malice, the court is probably correct in concluding that he was a "public figure."

It does not seem to me to follow quite so inescapably that the complaint should be dismissed.

We are in agreement that the jury could reasonably have concluded that the comments in issue were both false and defamatory. From the trial we know that the writer had been employed at the publication for which the plaintiff wrote, and was in a position to have observed his work and the process of rewriting that he purported to describe. If the jury could reasonably find that what was written was both false and defamatory, and that the writer was in a position to know the truth, I do not see how it can be determined as a matter of law that what was written was not knowingly false or written with reckless disregard for the truth. Indisputably the fact that the writer's views were shared by a senior editor of the sports publication, and others in a position to know, is powerful evidence for the defendant on the issue of constitutional malice. Nonetheless, a factual issue is presented that entitles the plaintiff to a new trial.

One other observation in the court's opinion merits comment, and that is the view that the defendants' assertions that plaintiff was not a "graceful wordsman" and possibly the "worst writer" at the magazine, were statements of fact. This conclusion is clearly based on the judgment that these statements were "mixed opinions", that is, opinions implying the existence of unstated facts. (Cf. *Hotchner v Castillo-Puche,* 551 F2d 910, 913.) However, the purportedly factual statements in the article with regard to the rewriting allegedly required by plaintiff's pieces could, at least arguably, have been evaluated by readers as setting forth the underlying facts.

For the reasons indicated above, I would reverse the judgment and remand the case for a new trial.

BIRNS and MARKEWICH, JJ., concur with MURPHY, P. J.; FEIN and SANDLER, JJ., dissent in part in an opinion by SANDLER, J.

Judgment, Supreme Court, New York County, entered on February 16, 1979, reversed, on the law, and vacated, and the

complaint dismissed. Appellants shall recover of respondent $75 costs and disbursements of this appeal.